UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEPHEN F. FRYER,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              09-10178-MBB


A.S.A.P. FIRE AND SAFETY
CORPORATION, INC., JOSEPH
SHEEDY AND BRIAN COTE,
        Defendants.

**MEMORANDUM AND ORDER RE:
DEFENDANT A.S.A.P. FIRE AND SAFETY CORPORATION, INC.'S,
DEFENDANT JOSEPH SHEEDY'S AND DEFENDANT BRIAN COTE'S
MOTION FOR A NEW TRIAL PURSUANT TO FED. R. CIV. P.
59 OR, IN THE ALTERNATIVE, FOR REMITTITUR(DOCKET
ENTRY # 60); DEFENDANT A.S.A.P. FIRE AND SAFETY
CORPORATION, INC.'S, DEFENDANT JOSEPH SHEEDY'S AND
DEFENDANT BRIAN COTE'S MOTION TO EXTEND THE TIME
FOR FILING A NOTICE OF APPEAL PURSUANT TO
FED. R. APP. P. 4(a)(5)
(DOCKET ENTRY # 64)**

**August 12, 2010**


**BOWLER, U.S.M.J.**

        On November 24, 2009, a jury returned a verdict in favor of

plaintiff Stephen F. Fryer ("plaintiff"), a member of the

Massachusetts National Guard.  On December 4, 2009, defendants

A.S.A.P. Fire and Safety Corporation, Inc. ("ASAP"), plaintiff's

former employer, Joseph Sheedy ("Sheedy") and Brian Cote

("Cote"), who each own 50% of ASAP, (collectively:  "defendants")

filed their first motion for a new trial or, in the alternative,

a remittitur of the jury's $445,734 verdict under Rule 59, Fed.

R. Civ. P. ("Rule 59").[1]   (Docket Entry # 41).   Notwithstanding
the brevity of the two page motion, plaintiff filed a 12 page
substantive response and on January 25, 2010, this court issued a
22 page decision denying the motion.   A final judgment entered on
January 25, 2010.

On February 4, 2010, defendants filed the above captioned
second new trial motion or, in the alternative, for remittitur.
(Docket Entry # 60).   The motion raises the same three issues in
the first new trial motion but details the nature of the
challenge with a seven page supporting memorandum.[2]   The three
grounds, identical in both motions, read as follows:

> 1.   The jury verdict is contrary to the clear weight of the
> evidence such that upholding the verdict will result in a
> miscarriage of justice;
>
> 2.   The damages awarded are outrageously excessive, so as to
> shock the judicial conscience and raise an irresistible
> inference that passion, prejudice, or some other improper
> cause impaired the jury's decisionmaking; and
>
> 3.   That prejudicial error occurred.

(Docket Entry # 60).

In addition to the second new trial motion, on March 11,
2010, defendants filed a motion to extend the time to file an

---

[1]   The above figure does not include a prejudgment interest
award of $33,532.99, a doubling of a $42,234 back pay award under
38 U.S.C. § 4323(d)(1)(C), a trebling of a $4,650 award for
commissions and a trebling of a $4,240 award for unpaid overtime
made by this court on January 25, 2010.   (Docket Entry # 56).

[2]   Plaintiff neglected to file a memorandum to support the
first new trial motion.

appeal under Rule 4(a)(5), Fed. R. App. P.  (Docket Entry # 64).
Defendants maintain that they filed the first new trial motion
before "the expiration of ten (10) days from the jury's verdict"
and they filed the second new trial motion "within the prescribed
ten (10) day period."  (Docket Entry # 65).

Defendants timely filed the first new trial motion on
December 4, 2009, after the jury returned its verdict but prior
to this court's decision regarding the additional amounts on
certain claims[3] and the final judgment.  See Greater Houston
Chapter of the American Civil Liberties Union v. Eckels, 755 F.2d
426, 427 (5th Cir. 1985) (language in Rule 59(b) "does not
explicitly require that a motion for new trial be made after
judgment is entered, and it has not been interpreted to include
this requirement"); 12 James Wm. Moore Moore's Federal Practice §
59.11[1][b] (3rd ed. 2010) (Rule 59(a) motion "may be made before
judgment has actually been entered").  Effective December 1,
2009, a new 28 day period replaced the former ten day period for
filing new trial motions.  See Rule 59(b), Fed. R. Civ. P.; see
also Advisory Committee Notes, Rule 59, 2009 Amendments.  It is
not necessary to determine whether the ten or 28 day period
applies to a jury verdict that precedes December 1, 2009, and a
new trial motion filed after December 1, 2009.  Applying either
the ten or 28 day period, the first new trial motion challenging

---

[3]  See fn. one.

the jury verdict is timely filed.

As to the timeliness of the second new trial motion, whether the motion is construed as a Rule 59(e) motion or a Rule 59(a) motion, as discussed infra, both types of Rule 59 motions require the moving party to file the motion "no later than 28 days after entry of judgment."  Rule 59(b), Fed. R. Civ. P.; <u>accord</u> Rule 59(e), Fed. R. Civ. P. (motion "must be filed no later than 28 days after the entry of the judgment").  The 28 day time period after entry of the judgment is mandatory.  <u>See Dresdner Bank AG v. M/V OLYMPIA VOYAGER</u>, 465 F.3d 1267, 1271 (11th Cir. 2006) ("ten day period for filing a Rule 59 motion is jurisdictional and cannot be extended"); <u>accord</u> <u>Torres-Arroyo v. Rullan</u>, 436 F.3d 1, 6 (1st Cir. 2006) ("motion for a new trial must be filed in the district court within ten days after the entry of judgment" and "[t]hat time period is mandatory").  Judgment entered on January 25, 2010, when this court disposed of the additional monetary relief plaintiff requested on the various claims which then ended the case.  <u>See Diaz-Reyes v. Fuentes-Ortiz</u>, 471 F.3d 299, 301 (1st Cir. 2006); Rule 54(a) (defining "judgment" as "any order from which an appeal lies"); Rule 79(a), Fed. R. Civ. P.; Rule 4(a)(7)(A), Fed. R. App. P.; <u>see also</u> 28 U.S.C. § 1291.  The entry of the judgment took place the same day.  <u>See Dresdner Bank AG v. M/V OLYMPIA VOYAGER</u>, 465 F.3d at 1271.

4

If "a party *timely* files" a motion for a new trial, the time to appeal runs "from the entry of the order disposing of the last such remaining motion."  Rule 4(a)(4)(A), Fed. R. App. P. (emphasis added).  Because defendants timely filed the second new trial motion, the 30 day time period has not expired.  The motion to extend the time period (Docket Entry # 64) is therefore moot.[4]

## PROCEDURAL BACKGROUND

After hearing five days of testimony, the jury rendered the verdict finding that defendants violated the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4311 et seq. ("USERRA"), by failing to reemploy plaintiff in his preservice position at ASAP, discriminating and retaliating against him because of his military service and terminating him because of his military service.  The jury also found that each defendant acted wilfully under USERRA thereby laying the foundation for this court's doubling of the $42,234 back pay award under 38 U.S.C. § 4323(d).  See Deel v. West Virginia EMS Technical Support Network, Inc., 2009 WL 2213473, *3 (S.D.W.Va. July 23, 2009) ("[i]f the discrimination were willful[sic], the employer

_____

[4] This court expresses no opinion as to the scope of any such appeal and whether it would encompass the issues in the first or the second new trial motion.  This court simply concludes that the second new trial motion altered and thereby extended the 30 day time period to file an appeal thereby mooting the request to extend that time period.

could be liable for double that amount").

The jury also found that defendants discriminated and retaliated against plaintiff because of his military service in violation of Massachusetts General Laws chapter 151B ("chapter 151B").  In light of the instructions not to award duplicative damages, the jury did not make a back pay award under chapter 151B.  It did, however, award plaintiff front pay in the amount of $105,000 and emotional distress damages of $289,000 under chapter 151B.  The jury declined to make an award of punitive damages.

With respect to the remaining two claims presented to the jury, it awarded overtime wages in the amount of $4,240 against ASAP under Massachusetts General Laws chapter 151 ("chapter 151") which this court trebled to $12,720.  Finally, the jury awarded plaintiff lost wages in the form of sales commissions amounting to $610 before July 13, 2008, and $4,650 after July 13, 2008 under Massachusetts General Laws chapter 149 ("chapter 149").  This court trebled the latter lost wages award.

FACTUAL BACKGROUND

The facts set out in the opinion denying the first new trial motion have not changed.  They are, as previously stated, as follows.

Plaintiff, a 43 year old high school graduate who attended

6

two semesters of college, obtained a fire sprinkler inspection certificate in December 2004.  He initially worked as a sprinkler helper and then as a sprinkler fitter at various companies before joining ASAP in January 2006.

At ASAP, plaintiff worked servicing and installing sprinkler systems.  His duties gradually evolved to focus more on sales and service.  By the start of 2007, his salary had increased from $17 to $19 an hour and he enjoyed a company vehicle, telephone and business card.  In addition to the hourly base rate of pay, plaintiff received 10% commissions on sales of new equipment or new service of sprinkler systems that resulted in a new account. The company vehicle helped plaintiff make sales and, together with a company gas card, reduced his commuting cost.  Plaintiff loved his job and proved successful in the sales aspect of it.

At the February 15, 2007 annual kick off meeting, he received commendation and recognition for his sales work.  He generated a plethora of sales (Ex. 5) and by the time he left for Iraq approximately 25% of his compensation came from commissions. Plaintiff's economics expert, Arthur M. Kenison, Ph.D. ("Kenison"), a professor of economic and business at St. Anselm College in Manchester, New Hampshire, testified that plaintiff earned a 51 week average of $1,010 per week in 2006.  After benefits, plaintiff's lost wages amounted to $42,110 in 2006, according to Kenison.

In January 2007, plaintiff accepted an offer to reenlist in the Massachusetts National Guard out of a sense of duty as well as for the health and pension benefits.  He did not expect to be deployed to Iraq.  Shortly after reenlisting, he spoke to William Plamondon ("Plamondon"), ASAP's Sales and Service Manager during the relevant time period, and explained it would not effect his work and only involve weekends.

On February 17, 2007, however, the Massachusetts Army National Guard issued a deployment letter to plaintiff. Plaintiff provided Plamondon with the letter a few days after the February 15, 2007 annual kick off meeting.  Plaintiff also spoke with Sheedy and Cote and notified them about his impending deployment.  On April 17, 2007, the Massachusetts National Guard issued an order requiring plaintiff to report for active duty on May 1, 2007.  Plaintiff reported for active duty on May 1 and left for training camp a few days later.  Expecting to return to ASAP, he left a set of tools in Plamondon's office.  In July 2007, plaintiff went to Kuwait and thereafter Iraq.

During his military service, plaintiff telephoned Plamondon once and sent him an email in late April 2008.  The April 23, 2008 email notified Plamondon that plaintiff should be back by the end of May and was looking forward to seeing everyone. During his military service, plaintiff also expected ASAP would pay an overdue commission to his wife, who remained at home with

their children.  ASAP did not make the payment.[5]

On May 7, 2008, plaintiff arrived home positive, upbeat and very excited to be back.  Looking forward to returning to the job he enjoyed, he stopped by ASAP's office and spoke to Plamondon the same day.  When plaintiff told Plamondon he was available to start work on May 12, 2008, however, Plamondon said there were no openings but he would consult with Sheedy and Cote and get back in touch with plaintiff.  During plaintiff's deployment, ASAP hired another individual, Matthew Tapley ("Tapley"), to work in plaintiff's stead.  According to Plamondon, if plaintiff had not been activated, Tapley would not have been hired.[6]  Sheedy and Cote also purchased another sprinkler company during plaintiff's military service.

Plamondon did not get back in touch with plaintiff.  After contacting the United States Department of Labor and the Employer Support of the Guard and Reserve, plaintiff sent ASAP a certified letter dated May 22, 2008, formally requesting reinstatement to

---

[5]  The failure lead to the jury's award of $610 of lost wages in the form of commission[s] definitely determinable before July 13, 2008.  (Ex. 9).

[6]  The relevant USERRA regulation provides that:

the employer may not, however, refuse to reemploy the employee on the basis that another employee was hired to fill the reemployment position during the employee's absence, even if reemployment might require the termination of that replacement employee.

20 C.F.R. § 1002.139(a).  Tapley remains employed at ASAP.

his position.  He advised ASAP that he planned to report to work on June 30, 2008, and directed ASAP to telephone him within seven days of receiving the letter to confirm the return date.

ASAP did not contact plaintiff until Plamondon telephoned plaintiff on Friday, June 27, 2008, instructing him to report to work on Monday, June 30, 2008.  Plaintiff arrived at work on Monday and spoke to Plamondon.  Plamondon advised plaintiff that ASAP had to give him a job.  The job he offered, however, was not an "escalator" position or plaintiff's preservice position or a position of like seniority, status and pay.[7]

In particular, Plamondon offered plaintiff a position as a sprinkler helper, a position that involved helping another sprinkler fitter.  The $3 increase in hourly pay to $22 was because plaintiff no longer needed ASAP's health insurance, according to plaintiff.  The new position lacked customer access as well as the opportunity to make commissions and sales[8] thereby reasonably resulting in a 25% loss of compensation in comparison to plaintiff's preservice position.  Indeed, in contrast to the

---

[7]  "A key provision of USERRA's reemployment protections is the 'escalator principle,' which 'requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service.'"  Fannin v. United Space Alliance, L.L.C., 2009 WL 928302, *5 (M.D.Fla. April 3, 2009) (quoting 20 C.F.R. § 1002.191).

[8]  Any opportunity during lunch breaks or after hours is not like the opportunity plaintiff had in his preservice position.

$9,292 in commissions earned in a 51 week period in 2006, plaintiff earned only $418 in commissions during the July to October time period that he worked at ASAP in 2008.  The new position also lacked a company vehicle, a company telephone and a company gas card, all of which plaintiff enjoyed in his preservice position.

Plaintiff accepted the position but continued to voice his desire to return to the position he had before his deployment. In addition to the loss of the company vehicle, telephone and gas card, the new position involved additional travel to transport another ASAP employee to and from work.  Plaintiff did not receive additional compensation for the extra ten hours the transport required each week.

In his new position, plaintiff reported to Gerald Goodwin ("Goodwin").  In late October 2008, Goodwin told plaintiff he was terminated.  The October 22, 2008 termination notice identified the reasons for termination as "being late for work twice and calling out sick three times all with in a 30 day period."  (Ex. 24).  Plaintiff was shocked.

Ample evidence supports viewing the reasons as pretextual with the real reason being plaintiff's military service and his complaints about not having the benefits and responsibilities of his preservice position.  During the four months in the new position, plaintiff sought and obtained permission from Goodwin

to leave work at 2 p.m. on July 23, 2008, in order to take his son to a police station.  On another occasion, plaintiff refused to work overtime on a Saturday because he was attending a wedding.

Goodwin gave plaintiff permission to leave early on September 12, 2008, for Massachusetts National Guard duty.  On September 24, 2008, plaintiff did not arrive at work until 10 a.m. because he had to put his children on the bus to school because his wife was at a hospital with her gravely ill mother. Plaintiff took one vacation day, approved by Goodwin, to undergo magnetic resonance imaging ("MRI") of a knee he injured in Iraq.[9] He was one hour late to work on October 6, 2008.  Sick with the flu, plaintiff notified ASAP and did not come to work on October 20 and 21, 2008.  ASAP did not request or require a doctor's note to support the absence.

The company's policy manual sets out a series of progressive disciplinary measures before terminating an employee.  The company did not adhere to this policy when it terminated plaintiff.  In addition, the company did not terminate the employment of another employee who was out sick four days during the week of October 20, 2008.  The record contains additional evidence of discriminatory and retaliatory motives.

_____

[9]  A notation on the relevant weekly time sheet inaccurately reflects that plaintiff "was never approved" for the vacation day.

12

Plaintiff's positive, upbeat attitude and self esteem, which he had when he returned from Iraq, deteriorated as a result of ASAP's failure to reinstate him in his previous position and the discrimination and retaliation he received because of his military service.  He began to argue more often with his wife and avoid his children.  After his termination, he grew more and more depressed and withdrew even more from his family.  He began and continues to take antidepressant medication.  He gained weight and experienced difficulty sleeping.  Plaintiff's brother-in-law recounted one occasion in which plaintiff visibly broke down after an argument with his wife.  His repeated and active attempts to obtain work over the course of the year following his termination proved unsuccessful which compounded the financial difficulties, the emotional stress and the depression he experienced.

## DISCUSSION

For the second time, defendants move for a new trial under Rule 59(a) or a remittitur of the verdict based on the same grounds raised in the first new trial motion.[10]  The motion does not identify the applicable subsection of Rule 59 but cites

---

[10]   In the memorandum in support of the motion to extend (Docket Entry # 65), defendants' counsel explains that he filed the first new trial motion "[a]s a precaution to preserve the Defendants' rights."  (Docket Entry # 65).

caselaw and grounds for relief uniformly associated with a motion under Rule 59(a).  Accordingly, this court construes the motion (Docket Entry # 60) as brought under Rule 59(a).[11]

Even if construed as a Rule 59(e) motion, however, there is no basis for relief.  Rule 59(e) motions, "often referred to as motions for reconsideration," Feinstein v. Moses, 951 F.2d 16, 19 (1st Cir. 1991), "'are granted only where the movant shows a manifest error of law or newly discovered evidence.'"  Prescott v. Higgins, 538 F.3d 32, 45 (1st Cir. 2008); see generally Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005) ("party must 'either clearly establish a manifest error of law or must present newly discovered evidence'" while also citing treatise identifying four grounds, to wit, "manifest errors of law or fact, newly discovered or previously unavailable evidence, manifest injustice, and an intervening change in controlling law").  Defendants challenge the sufficiency of the evidence; the excessive nature of the damages awarded including that such damages resulted from the jury's passion and prejudice; and the presence of a prejudicial error "fueled by the above" including the admission of certain photographs.  (Docket Entry #3 60 & 61).

---

[11]  Because the second motion is timely under Rule 59(b) and does not refer to Rule 60, Fed. R. Civ. P., it is not appropriate to construe the motion as seeking relief from a judgment or order under Rule 60.  See Perez-Perez v. Popular Leasing Rental, Inc., 993 F.2d 281, 284-285 (1st Cir. 1993) (discussing interrelation of Rules 59 and 60).

Articulated below in greater detail, none of these grounds provide an adequate basis under the circumstances for Rule 59(e) relief.

The opinion denying the first new trial motion sets out the applicable standard under Rule 59(a).  (Docket Entry # 57).  Briefly stated, Rule 59(a) requires a new trial "'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'"  Crowe v. Marchand, 506 F.3d 13, 19 (1st Cir. 2007); accord Burke v. McDonald, 572 F.3d 51, 57 (1st Cir. 2009) (reviewing "denial of a motion for a new trial or remittitur for abuse of discretion" and noting "'[w]e will order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice'").

Defendants first submit that the back pay award of $42,234 is contrary to the clear weight of the evidence because "Defendants did not afford its employees 'sick leave.'"  (Docket Entry # 61).  As set out in the termination notice, ASAP discharged plaintiff ostensibly because he was late for work on two occasions and called in sick on three occasions all within a 30 day time period.  (Ex. 24).  Plamondon, who signed the termination notice along with Goodwin, echoed this reason by testifying about plaintiff's excessive tardiness and absenteeism.  Goodwin testified that every instance of employee tardiness and

15

absence causes a disruption of the company's business.  Thus, evidence contrary to the back pay award certainly exists.

On the other hand, the record contains evidence that one of the three occasions was an approved vacation day.  The company did not discharge another employee who was out sick for a longer period of time.  Company calendars reflect employees out sick on a number of days with little, if any, evidence of their termination.  The company did not adhere to its policy of progressive disciplinary measures in discharging plaintiff. Other evidence in the record, including the proximity of the termination to plaintiff's return from the military and redeployment, provides additional evidence to support the back pay award.

As cogently explained by the <u>Sheehan</u>[12] court:

> Discriminatory motivation under USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.  <u>Cf.</u> <u>W.F. Bolin Co. v. Nat'l Labor Relations Bd.</u>, 70 F.3d 863, 871 (6th Cir. 1995).  In determining whether the employee has proven that his protected status was part of the motivation for the agency's conduct, all record evidence may be considered, including the agency's explanation for the

---

[12] <u>Sheehan v. Department of Navy</u>, 240 F.3d 1009, 1014 (Fed.Cir. 2001).

actions taken.

Sheehan v. Department of Navy, 240 F.3d at 1014.  In short,
because ample and sufficient evidence supports the back pay
award, the award is not against the demonstrable weight of the
credible evidence.[13]

Finally, the back pay award of $42,234 closely mimics the
$42,110 computation by plaintiff's economics expert.  The jury
rejected the expert's higher figure of $74,654.  The $42,234
figure is far from excessive and the record provides ample
evidence to support it.

Defendants next challenge the $610 and $4,650 awards for
unpaid commissions because plaintiff never raised the matter
until litigation commenced.  Plaintiff's failure to complain does
not negate the jury's verdict which ample evidence supports.
Defendants also submit that the award reflects gross as opposed
to net commissions.  An incentive worksheet for the March 2007
time period contains the $610 figure in the margin thus providing
support for the $610 unpaid commissions prior to July 13, 2008.
(Ex. 9).[14]

As reflected in plaintiff's initial compensation plan (Ex.
2), plaintiff testified about receiving a 10% sales commission

_____

[13]  The above ruling remains the same even assuming that
defendants did not have a formerly recognized sick leave policy.

[14]  Plaintiff testified that the handwriting in the margin was
not his handwriting.

for the referral of any new customer.  Plamondon, however, testified that the 10% commission was based on net profit.  The plan sets out a 10% sales incentive "on the total sale (excluding tax) resulting from any new account you bring in."[15]  (Ex. 2) (emphasis added).

After plaintiff's reemployment at ASAP, he met a number of times with the owner of Atlas Fireworks ("Atlas") who, as a result of these contacts, agreed to let ASAP bid on an extensive dry chemical installation job.  On October 1, 2008, plaintiff completed a customer lead sheet for the Atlas job.  ASAP secured the job and the company billed Atlas for a $27,900 deposit on November 20, 2008, shortly after plaintiff's termination.  A December 31, 2008 invoice reflects the second and final invoice of $18,600 for the job.  (Ex. 23).  Ten percent of the total sale for this job amounts to $4,650, which is the amount the jury awarded for definitely determinable but unpaid sales commission after July 13, 2008, under chapter 149.

Hence, the $610 and $4,650 sales commissions awards are not against the demonstrable weight of the credible evidence.  The amounts of the awards are also not excessive and do not result in a miscarriage of justice.

Defendants next seek a new trial or remittitur on the

---

[15]  The plan also sets out a profit incentive of %5 "based on job profit," i.e., net, and the discretion of Sheedy and Cote. (Ex. 2).

18

overtime compensation award of $4,240.  Defendants argue that
ASAP did not force plaintiff, who lives in Jaffrey, New
Hampshire, to provide transportation for Dan Mullen ("Mullen"),
an ASAP employee living in Lowell, New Hampshire.[16]

Chapter 151 allows the jury to award overtime compensation
for hours worked in excess of a 40 hour week at an hourly rate
that is not less than one and a half times the employee's regular
hourly rate.  Mass. Gen. L. ch. 151, § 1A.  Travel time to and
from work is ordinarily not compensable unless the employer
requires or directs the employee to perform the travel.  See 455
C.M.R. § 2.03.  Having been so instructed, the jury determined
that plaintiff was required or directed to transport Mullen.

The evidence is more than sufficient to support the
determination.  Plaintiff testified that his boss asked him to
provide the transportation for Mullen and that such
transportation added an estimated ten hours to plaintiff's work
week.  Goodwin testified that he asked plaintiff to pick Mullen
up and advised plaintiff he would give him a gas card if needed.

---

[16]  The memorandum reads as follows:

With reference to (4) $4,240 in unpaid overtime and mileage.
Again, ample and credible evidence was presented that
several employees of the Defendants volunteered and provided
transportation to work for a fellow employee who could not
otherwise provide transportation for himself.  The Plaintiff
was not forced but volunteered to help a fellow employee as
is the case so often in these situations.

(Docket Entry # 61).

Plaintiff provided the transportation from July to October 2008 and received $110 once to cover gasoline.[17]  Although a number of other ASAP employees volunteered to transport Mullen, plaintiff performed the bulk of the transport.  The award is not against the demonstrable weight of the credible evidence or a miscarriage of justice.

Defendants next argue that the $105,000 front pay award under chapter 151B is against the clear weight of the evidence.  Defendants assert that there was no evidence that plaintiff consistently applied and was denied employment opportunities on a consistent basis.  Plaintiff testified to conducting a diligent job search including visiting veterans agencies.  Plaintiff's wife, Christine Fryer, testified that plaintiff has been actively seeking work since the termination.  The jury therefore heard testimony about plaintiff conducting a consistent and diligent job search between the time of his termination and the time of trial without success.

The opinion denying the first new trial motion notes that plaintiff, age 43 at the time of trial, is relatively young in his work life.  His work experience speaks to future employment

---

[17]  Reducing the $4,240 award by the $110 payment results in a figure of $4,130.  Dividing the award by the minimum one and a half hourly compensation rate of $33 an hour yields approximately 128 hours of work or about 12 and a half weeks at ten hours a week.  Although not explicitly argued by defendants, the amount of the award is not excessive.

in the fire protection field.  (Ex. 29).  The jury found and the evidence supports that plaintiff fulfilled his duty to mitigate damages.  Rule 59(a) relief on the basis of insufficient evidence is inappropriate.

As a final argument, defendants attack the $289,000 emotional distress award under chapter 151B.  Defendants focus the argument on a lack of causal connection between the emotional distress and defendants' unlawful actions.  They maintain that plaintiff's military deployment caused whatever emotional distress he experienced.

Defendants correctly note that substantial evidence must support an award of emotional distress damages.  Having so instructed the jury and advised the jury of the relevant factors in DeRoche v. Massachusetts Com'n Against Discrimination, 848 N.E.2d 1197, 1202 (Mass. 2006), as well as the need to find both substantial evidence and a causal connection between the emotional distress and a defendant's unlawful acts, the jury awarded $289,000 under chapter 151B.

Contrary to defendants' argument, evidence in the record sufficiently supports the causal connection.  The jury heard testimony that plaintiff returned from Iraq in May 2008 in an upbeat mood, excited to be home and looking forward to returning to work.  He received multiple commendations for his military service and Christine Fryer testified that he returned from Iraq

21

with his self esteem intact.  As the discriminatory and retaliatory treatment continued at ASAP and even more so after the discriminatory termination, however, plaintiff's mood deteriorated.  According to his own testimony, he withdrew from the family, avoided the children, became "short with [his] family," sought medical treatment and began taking medication.

The prior opinion fully details the evidence that establishes that the chapter 151B award for emotional distress is not against the demonstrable weight of the credible evidence and, contrary to defendants' additional argument (Docket Entry # 61, ¶ II), is neither excessive nor a result of prejudice and passion. For convenience, the relevant portion of the opinion reads as follows:

> The record supports a finding that plaintiff went into a deep depression and became a changed person after the termination.  He sought and obtained medical treatment, which included taking an antidepressant and sleep aid.  See Tobin v. Liberty Mutual Insurance Co., 553 F.3d at 145 (upholding $500,000 emotional distress damages award and distinguishing 1999 decision reducing $716,000 award in which the plaintiff did not seek medical treatment to $250,000).[18]  There was little evidence that the deterioration in plaintiff's emotional condition will abate. He continues to take the antidepressant.
>
> His wife and brother-in-law uniformly testified to a changed individual.  Plaintiff became short tempered with his family.  He also became withdrawn from his family and continues to avoid family activities.  In contrast to the "nice family" his wife testified existed before the discriminatory and retaliatory treatment in 2008, plaintiff

_____

[18]  The full citation is Tobin v. Liberty Mutual Insurance Co., 553 F.3d 121, 145 (1st Cir. 2009).

22

argues with his wife and family.  His brother-in-law described a particularly divisive argument that visibly and emotionally effected plaintiff.  See McDonuogh v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006) (discussing prior award upheld partly because of the plaintiff's testimony that the employment discrimination caused marriage to suffer).  Plaintiff avoids his children and has gained weight.

Although the award is undeniably generous, particularly in light of the relatively short period of the employment prior to the May 2007 deployment, it is not so grossly disproportionate to the emotional injury the evidence established such that it would be unconscionable to let it stand.  See, e.g., Tobin v. Liberty Mutual Insurance Co., 553 F.3d at 144-145; McDonough v. City of Quincy, 452 F.3d at 22 (upholding $300,000 compensatory award the bulk of which represented emotional distress damages).  As a final matter, it is also worth recognizing "'"the esoteric nature of damages for emotional distress."'"  Tobin v. Liberty Mutual Insurance Co., 553 F.3d at 145.  Thus, the "'disinclination to second-guess a jury's evaluation of the proper amount of damages is magnified where,'" as here, "'the damages entail a monetary valuation of intangible losses.'"  Blinzier v. Marriott International, Inc., 81 F.3d 1148, 1161 (1st Cir. 1996).

In sum, a new trial is not warranted.  A remittitur, even on the generous emotional distress damages, is likewise not required.

(Docket Entry # 57).

Adding to the above reasoning, the jury did not award punitive damages.  Furthermore, this court instructed the jury that, "damages should not be based on sympathy, prejudice, bias or emotion" and "that damages should not be speculative or based on conjecture or on mere possibilities."  See Evans v. Avery, 100 F.3d 1033, 1041 (1st Cir. 1996) ("[j]urors are presumed to follow the court's instructions").  Hence, the award did not result from prejudice or passion.  Although defendants challenge the

23

admission of photographs of plaintiff while serving in the
military (Ex. 10) as prejudicial, the foregoing instructions
ameliorate any such alleged passion or prejudice.  See Grossmith
v. Noonan, 607 F.3d 277, 280 (1st Cir. 2010) (jury instructions
"that sympathy could not be a basis for the verdict" helped cure
any alleged error in admission of purportedly irrelevant
photograph).  The photographs provided relevant and important
background evidence.  The relevance of the photographs was not
substantially outweighed by any sympathy or passion engendered by
virtue of the relatively dispassionate war scenes.  See Rule 403,
F.R.E.

CONCLUSION

Accordingly, the second motion for a new trial or a
remittitur (Docket Entry # 60) is **DENIED.**  The motion to extend
(Docket Entry # 64) is **DENIED** as moot.  This court will address
the motion for attorneys' fees and costs (Docket Entry # 46) and
prejudgment interest on such fees at a later date.

   /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge